## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

ANNA M. TARPENNING,                  )
                                     )
            Plaintiff,               )
                                     )
v.                                   )        Case No. 11-CV-781-PJC
                                     )
CAROLYN W. COLVIN, Acting Commissioner )
of the Social Security Administration,[1] )
                                     )
            Defendant.               )

## OPINION AND ORDER

Claimant, Anna M. Tarpenning ("Tarpenning "), pursuant to 42 U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying her applications for disability insurance and supplemental security

income benefits under the Social Security Act, 42 U.S.C. §§ 401 *et seq.* In accordance with 28

U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States

Magistrate Judge. Any appeal of the order will be directly to the Tenth Circuit Court of Appeals.

Tarpenning appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the

Commissioner erred because the ALJ incorrectly determined that she was not disabled. For the

reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Claimant's Background

At the time of the December 2, 2010 hearing before the ALJ, Tarpenning was 47 years

old. (R. 31). She was approximately 5' 7" and weighed 275 pounds. *Id.* She was a high school

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting
Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as
Defendant in this action. No further action need be taken to continue this suit by reason of the
last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

graduate, held an executive secretary diploma, and was a registered medical assistant.  (R. 32-33).  She had worked several years as a legal secretary and as a legal assistant.  (R. 34-35).  Her last position was as an advanced technical service representative for DISH Network from August 2004 to September 2008.  (R. 33-34).  She testified that she had to leave this position due to air pollutants and irritants causing problems with her asthma.  *Id.*  Tarpenning testified that pain in her hips, legs, back, neck, and arms, as well as frequent headaches and asthma kept her from returning to work.  (R. 36).

Tarpenning testified that pollutants, dusts, fumes, and gases made her asthma symptoms worse.  (R. 37).  Extreme weather, hot, cold, and wind, also exacerbated her asthma.  (R. 37-38).  She described taking several medications for her asthma, including use of a nebulizer, and an emergency inhaler.  (R. 37).  She testified that she used her nebulizer approximately six times a day.  *Id.*  She also testified to using the emergency inhaler approximately once a day.  *Id.*

Tarpenning testified that she got headaches once or twice a day, which were made worse by a lot of noise and really bright, florescent lights.  (R. 38).  Tarpenning reported taking Esgic[2] for her headaches, and then needing to rest for thirty minutes to an hour.  *Id.*

Tarpenning testified that she had trouble with her right shoulder catching and had surgery on it several years earlier.  (R. 39).  Tarpenning did not wear a brace for her shoulder.  *Id.*  She also described weakness in her right hand that prevented her from being able to pick up items using her fingers and thumb.  (R. 45-46).  She testified that she could write with her dominant right hand only if she held it with her left hand, and that she had to use her left hand to eat.  (R.

---

[2] Esgic is used in the treatment of migraine and tension headaches.  *Dorland's Illustrated Medical Dictionary* 269, 654 (31st ed. 2007).

46).  She described difficulty reaching with her right arm but not with her left.  *Id.*  She testified that she might be able to change a lightbulb above her head with her right hand.  (R. 40).

Tarpenning testified that she also had pain in her hips, which was made worse by a lot of sitting, standing, and walking.  *Id.*  She described trouble twisting her body from side-to-side.  (R. 41).  In addition to the hip pain, Tarpenning had pain in her lower back, which she attributed to muscular problems and fibromyalgia.[3]  (R. 44).  She testified that the pain prevented her from bending over more than halfway to touch her knees.  *Id.*  Tarpenning also described neck spasms and pain.  (R. 41).  She said that it would probably hurt her to tilt her head up or down for longer than one minute.  (R. 42-43).  She stated that the doctors also attributed this pain to fibromyalgia.  (R. 41).

Tarpenning testified that she kept re-injuring her right knee and had four prior surgeries on her knee.  (R. 43).  She had anterior cruciate ligament ("ACL") tears, meniscus tears, and was prone to arthritis.  *Id.*  Tarpenning described pain, stiffness, weakness, and swelling in her right knee.  *Id*.  She testified that she could not get up from a squatting position, unless she held onto something.  (R. 43-44).

In describing her limitations, Tarpenning testified that she could not go up and down a flight of stairs without falling.  (R. 45).  She estimated that she could sit for approximately ten to fifteen minutes before needing to stand up, and in fact, stood during the hearing.  (R. 48).  She stated she could stand for five to ten minutes before needing to sit down.  *Id.*  She estimated that she could walk half a block before needing to rest.  *Id.*  She stated that she could pick up a gallon

---

[3] Fibromyalgia is "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points."  *Dorland's* at 711.

3

of milk, but she could not pick up a ten pound bag of sugar.  (R. 49).

Tarpenning also described experiencing depression and anxiety, but testified that her medications helped.  (R. 46-47).  She stated that these conditions caused difficulties interacting with people.  *Id.*  Large crowds and noises would make her nervous.  (R. 47-48).

In describing her activities of daily living, Tarpenning testified that she did not do dishes, dust her furniture, sweep or mop the floors, vacuum her carpets, make her bed, do her laundry, or cook.  (R. 50-51).  She was, however, able to drive and shop.  (R. 41-42, 51).  She was not involved with any clubs, organizations, or churches, but she would go visit a friend and her mother.  (R. 51).  She stated she had trouble sleeping due to pain and averaged only two or three hours of sleep on a typical night.  (R. 52-53).  After taking her medication, she could nap during the day.  (R. 53).  She testified that side effects from her multiple medications included nervousness, drowsiness, and frequent urination.  (R. 49-50).

Tarpenning presented to her treating physician, Terence M. Williams, D.O., on September 27, 2007, after experiencing severe asthma symptoms.  (R. 307).  Tarpenning complained of cough, congestion, and wheezing.  *Id.*  Dr. Williams noted that her symptoms began with the onset of the ragweed season.  *Id.*  During the visit, she had a frequent cough, but almost no wheezing.  *Id.*  It was noted that Tarpenning had been without medication for approximately one month due to financial reasons and she declined an allergy injection.  *Id.*  Dr. Williams' assessment was asthma and reactive airways disease[4]  secondary to allergies; he provided her with samples of medication for her asthma and her cough.  *Id.*

---

[4] Reactive airways disease is defined as "any of several conditions characterized by wheezing and allergic reaction; the most common ones are asthma, bronchiolitis, and chronic obstructive lung disease."  *Dorland's* at 548.

On October 12, 2007, Dr. Williams saw Tarpenning for a follow-up visit.  (R. 306).

Tarpenning reported occasional coughing and heart racing.  *Id*.  Dr. Williams noted that her

lungs sounded fairly clear, but with a very faint expiratory wheeze on the left side.  *Id*.

Tarpenning also reported experiencing stress, anxiety, and depression.  *Id*.  She reported a lot of

family stress, in part due to having help provide care for her mother, who had dementia.  *Id*.  Dr.

Williams noted that Tarpenning admitted to feeling sad, having crying spells, sleep disturbances,

and having a loss of interest in usual activities.  *Id*.   Dr. Williams prescribed Celexa and Xanax

to help with her anxiety and depression and continued her asthma medication.  *Id.*

On November 29, 2007, Tarpenning was seen by Dr. Williams for treatment of an upper

respiratory infection superimposed on her asthma.  (R. 305).  Dr. Williams observed scattered

rhonchi[5] with mild expiratory wheezing and no consolidated sounds.  *Id.*  Dr. Williams noted that

Tarpenning had not been using her nebulizer as instructed and she had a flare-up in her asthma.

*Id.*  She was given medication samples and instructed on the proper way to do her breathing

treatments with the nebulizer.  *Id.*

Tarpenning reported back to Dr. Williams on December 7, 2007 with continued

coughing, congestion, and shortness of breath.  (R. 304).  Dr. Williams noted that she had

decreased breath sounds, few bronchial secretion sounds, and no wheezing.  *Id.*  Tarpenning was

diagnosed with an upper respiratory infection with chronic bronchitis, although Dr. Williams

noted it was more of an inflamation problem than an infection problem.  *Id.*  Dr. Williams

changed her medications to see if her symptoms improved.  *Id.*

---

[5] Rhonci is a dry, low-pitched noise produced in the bronchial tube due to a partial
obstruction.  *Dorland's* at 1667.

5

On March 17, 2008, Tarpenning had an MRI of her right knee which revealed a small joint effusion.[6]  (R. 333).  Otherwise, the MRI was unremarkable; the marrow was within normal limits, there was no joint dislocation or subluxation, no tears in the menisci, and all ligaments and tendons were intact.  *Id.*

At a follow-up appointment on April 4, 2008, Dr. Williams noted that Tarpenning's lungs were clear, although she was suffering from chronic allergy symptoms.  (R. 303).  It was noted that Tarpenning came to the appointment on crutches due to a work-related knee injury.  *Id.*  Dr. Williams gave Tarpenning an anti-inflammatory injection as well as additional medication samples and inhalers.  *Id.*

On April 30, 2008, Tarpenning saw Robert W. Nebergall, D.O., for her knee injury, which reportedly occurred on February 22, 2008.  (R. 334-35).  After reviewing an MRI of Tarpenning's right knee, Dr. Nebergall diagnosed her with a partial ACL tear.  *Id.*  Dr. Nebergall recommended arthroscopic ACL reconstruction with allograft.[7]  *Id.*  Tarpenning was restricted to light duty and Dr. Nebergall noted she would need prolonged physical therapy, with a limitation on jumping, twisting, or turning for six months.  *Id.*  She was prescribed Lortab and Naprosyn for pain and inflammation.  *Id.*

On May 12, 2008, Dr. Nebergall performed arthroscopic surgery on Tarpenning's right knee to repair the ACL tear.  (R. 318-32, 336-44).  Dr. Nebergall's postoperative diagnoses were

---

[6] Effusion is "the escape of fluid into a part or tissue."  *Dorland's* at 603.

[7] Allograft is a tissue graft.  *Dorland's* at 52.

a partial ACL tear, chondromalacia,[8] and synovial impingement.[9]  (R. 328).  After recovery, she was discharged with a prescription of Lortab.  (R. 322, 341-43).

Tarpenning presented to Dr. Williams on June 20, 2008 for a medication refill and reported back pain, as well as breathing problems that had caused her to leave work early three days in a row.  (R. 302).  Dr. Williams provided her with inhaler samples and prescribed Soma.[10]  *Id.*

On July 1, 2008, Tarpenning present to Dr. Williams with complaints of coughing, congestion, and allergy symptoms.  (R. 300).  Dr. Williams noted that Tarpenning had moderate nasal edema[11] and moderate postnasal drainage, but no wheezing.  *Id.*  Dr. Williams diagnosed Tarpenning as having asthmatic bronchitis and probable allergies.  *Id.*  He increased her inhaler dosage and prescribed Augmentin.[12]

On August 6, 2008, Tarpenning requested a work release from Dr. Williams after experiencing an asthma flare-up.  (R. 299).  Dr. Williams noted Tarpenning had "breathing difficulties lately with the high heat and humidity in the high ozone amounts."  *Id.*  However, examination revealed that her lungs were clear with the exception of "fine mild expiratory wheezing at end expiration."  *Id.*  Dr. Williams released her back to work.  *Id.*

---

[8] Chondromalacia is "the softening of the articular cartilage."  *Dorland's* at 358.

[9] Synovial impingement is the pinching of the knee joint lining with movement.  *Dorland's* at 936, 1878.

[10] Soma is a muscle relaxant.  *www.pdr.net.*

[11] Edema is a medical term for swelling, or the presence of abnormally large amounts of fluid.  *Dorland's* at 600.

[12] Augmentin is used to treat infections.  *Dorland's* at 66, 181, 376.

Tarpenning presented to Dr. Williams again on November 4, 2008 with complaints of dry cough, congestion, and wheezing.  (R. 298).  Dr. Williams noted that she had decreased breath sounds and a "very minute expiratory wheeze on forced expiration."  *Id.*  His diagnosis was severe and persistent asthma.  *Id.*  Dr. Williams changed Tarpenning's asthma medications in the hope it would get her symptoms under control.  *Id.*

On December 17, 2008, Tarpenning saw Dr. Williams and reported persistent cough, congestion, and wheezing.  (R. 297).  Tarpenning reported using her nebulizer four to five times a day, in addition to her rescue inhaler.  *Id.*  Dr. Williams noted decreased breath sounds, but no noticeable wheezing.  *Id.*  Dr. Williams advised Tarpenning that living with a smoker made it difficult to control her asthma.  *Id.*  Tarpenning was diagnosed with reactive airways disease, and her medications were adjusted again.  *Id.*

On April 27, 2009, Tarpenning saw Dr. Williams for a follow-up on her asthma, and reported swelling in her lower extremities and chronic low back pain.  (R. 296).  Physical examination revealed mild, "trace" edema in her lower extremities and "some trigger points in the low back."  *Id.*  The exam also showed her lungs were clear other than "some fine expiratory wheezing on forced expiration."  *Id.*  Dr. Williams provided her with medication samples and recommended exercise and weight loss to help her lower back.  *Id.*  Dr. Williams noted that Tarpenning was no longer employed and that she had tried several jobs, but she believed no one would hire her because of her asthma and coughing.  *Id.*

On July 16, 2009, Tarpenning was examined by Dr. Nebergall for right knee and leg pain secondary to a fall from two months earlier.  (R. 365).  Tarpenning described her pain as achy and throbbing in nature, which was made worse by prolonged standing and walking, and

8

partially relieved with rest. *Id.* Dr. Nebergall ordered an MRI, which was completed on July 22, 2009. (R. 350-51, 365). The MRI revealed scarring and ossification of the patellar tendon, a small radial tear on the lateral meniscus, mild chondromalacia and mild cartilage thinning in the medial compartment. (R. 350-51). After reviewing the MRI, Dr. Nebergall recommended another arthroscopy of Tarpenning's right knee due to the torn lateral meniscus. (R. 366).

On August 7, 2009, Dr. Nebregall performed another arthroscopic surgery on Tarpenning's right knee. (R. 345-49, 352-64, 367-72). Tarpenning tolerated the procedure well and was discharged with a prescription of Lortab for pain. (R. 360, 369).

On September 27, 2009, Tarpenning presented to Dr. Williams and reported that her cough had worsened in the last week and coughed to the point of almost passing out. (R. 422). Upon examination, Dr. Williams noted slightly decreased breath sounds, "some moderate coarse rhonchi" on forced expiration, and no wheezing. *Id.* Dr. Williams noted Tarpenning either had the beginning of an infection, or had an asthma flare-up due to the combination of pollen and secondhand smoke. *Id.* She was given a steroid injection and asthma medication. *Id.*

On December 29, 2009, Tarpenning saw Dr. Williams for another asthma flare-up. (R. 423). Dr. Williams noted that she coughed throughout the visit. *Id.* He gave Tarpenning a breathing treatment and noted that the coughing subsided somewhat and that no wheezing was heard after the treatment. *Id.* Dr. Williams prescribed a steroid and recommended she increase her water intake and decrease her caffeine intake. *Id.* Dr. Williams noted that as Tarpenning was leaving, "she told me she was going straight to the Casino. Of course casino is full of cigarette smoke anyway." *Id.*

On January 22, 2010, Tarpenning reported an improvement in her asthma, but

complained of muscle pain and tenderness in her arms and legs.  (R. 424).  Dr. Williams noted

that 12 out of 12 places he pressed were trigger points, but that none of her joints were hot, red,

or swollen.  *Id.*  He diagnosed Tarpenning with probable fibromyalgia and noted that due to

Tarpenning's lack of insurance, he was unable to perform any lab work to rule out other causes.

*Id.*  Dr. Williams provided Tarpenning with a handout about fibromyalgia, adjusted her

medications, and recommended daily exercise and plenty of rest.  *Id.*

On March 8, 2010, Tarpenning presented to Dr. Williams with complaints of diffused

pain in her arms, legs, and back every morning.  (R. 425).  Tarpenning expressed that, after

reading the pamphlet, she believed she had fibromyalgia.  *Id.*  She reported having morning

stiffness and stiffness after long periods of sitting, headaches, and numbness and tingling in her

extremities.  *Id.*  Physical examination revealed "just about 18 out of 18 points" were tender to

the touch.  *Id.*  Dr. Williams gave her a trial of Cymbalta.[13]  *Id.*

On March 24, 2010, Dr. Williams completed a fibromyalgia syndrome medical

assessment form, a form provided by Tarpenning's attorney.  (R. 397-401, 425).  Dr. Williams

indicated Tarpenning met the diagnostic criteria for fibromyalgia and exhibited chronic fatigue

syndrome; he also noted she had asthma and back pain.  (R. 397).   Dr. Williams marked that

Tarpenning had chronic pain, non-restorative sleep, muscle weakness, breathlessness, morning

stiffness, subjective swelling, frequent, severe headaches, numbness and tingling/paresthesia,

sicca[14] symptoms, chronic fatigue, anxiety/panic attacks, irritable bowel syndrome, and

_____

[13] Cymbalta is an antidepressant that may also be used to manage chronic pain.
*www.pdr.net*.

[14] Sicca syndrome is an autoimmune disorder affecting the function of the glands that
produce saliva and tears.  *Dorland's* at 1871.

depression.  *Id.*  He noted that she had muscle spasms, muscle weakness, chronic fatigue, tenderness, impaired sleep, limitation of motion, weight change, and reduced grip strength.  (R. 398).  He indicated that her symptoms would frequently interfere with her attention and concentration in a typical workday.  *Id.*  He marked that Tarpenning should not be exposed to work hazards, strict deadlines, public contact, or close interaction with coworkers or supervisors, and would be unable to perform routine, repetitive tasks at a consistent pace, or detailed or complicated tasks.  (R. 398-99).

Dr. Williams also noted on the form that Tarpenning could walk four city blocks without rest or severe pain.  (R. 399).  He further noted that Tarpenning could sit for fifteen minutes at one time, which would need to be followed by time lying down to relieve pain.  *Id.*  He indicated Tarpenning could stand for five minutes, but would need to sit or lie down afterward.  *Id.*  Dr. Williams indicated that Tarpenning could sit for less than two hours total in an 8-hour work day, and she could stand/walk for less than two hours as well.  *Id.*  She would need to take more than ten unscheduled 30-minute breaks to rest during a work day and would likely be absent from work more than four days a week.  (R. 399-401).  Dr. Williams noted that Tarpenning could occasionally lift and carry less than ten pounds and rarely lift and carry ten pounds and should not stoop, twist, or reach.  (R. 400-01).  She was limited to using her hands for grasping, turning, and twisting objects for only 1% of the work day; fine manipulations of her fingers for 50% of the work day; and should never reach with her arms.  *Id.*  Dr. Williams noted that Tarpenning should avoid exposure to high humidity, perfumes/colognes, fumes/gases, cigarette smoke, dust, outdoor heat and cold, cleaners, and food odors.  (R. 401).

On April 22, 2010, Tarpenning presented to Dr. Nebergall for a work-related knee injury,

11

which she said occurred three days earlier, while she was assisting a patient.  (R. 409-10).

Tarpenning described the pain as intermittent aching, stabbing, and throbbing in nature,

precipitated by prolonged standing, walking, and climbing.  (R. 409).  An x-ray showed diffuse

mild to moderate degenerative changes and an MRI performed on April 29, 2010 showed a small

joint effusion and an abnormality suggestive of a lateral meniscus tear.  (R. 409, 411).

On May 21, 2010, Dr. Nebergall performed a third right knee arthroscopy on Tarpenning.

(R. 403-05).  Dr. Nebergall noted that Tarpenning tolerated the procedure well.  (R. 403).  At a

postoperative visit on June 3, 2010, Dr. Nebergall noted that Tarpenning was complaining of

expected postoperative pain.  (R. 413).  Tarpenning was instructed to follow a self-directed

rehabilitation program and progress with activities as tolerated.  *Id.*

On June 24, 2010, Tarpenning returned to Dr. Nebergall for a follow-up of her knee, but

also had new complaints of right shoulder pain, secondary to a fall.  (R. 414-15).  Dr. Nebergall

noted mild effusion in her shoulder and pain throughout flexion of the shoulder.  (R. 414).  His

impression was that Tarpenning had a torn rotator cuff tendon and he ordered an MRI of her

shoulder.  *Id.*  He noted that in regards to her knee, Tarpenning was to continue with her self-

directed rehabilitation, participate in activities as tolerated, and was dismissed from his care.  (R.

415).

The MRI of Tarpenning's right shoulder showed "[s]ubtle dysplastic changes of the

acromioclavicular joint" and "[m]inimal tendinosis of the supraspinatus tendon."  *Id.*  On July 8,

2010, Dr. Nebergall noted the results of the MRI and prescribed physical therapy and Mobic.[15]

(R. 416).

---

[15] Mobic is a non-steroidal anti-inflammatory drug.  *Dorland's* at 1143, 1189.

12

Tarpenning presented to Dr. Williams on July 6, 2010 with cold symptoms.  (R. 426-27).
Dr. Williams noted decreased breath sounds, scattered rales,[16] and mild wheezing.  (R. 427).
Tarpenning was diagnosed with an acute upper respiratory infection and prescribed antibiotics.
*Id.*

On July 29, 2010, Tarpenning saw Dr. Nebergall for a follow-up of her shoulder injury.
(R. 417).  Dr. Nebergall noted she had forward flexion to "180 degrees with marked pain through
the painful arc."  *Id.* She was instructed to replace the Mobic with ibuprofen, continue her self-
directed rehabilitation program, and was discharged from Dr. Nebergall's care.  *Id.*

On August 18, 2010, Tarpenning presented to Dr. Williams with complaints of moderate
to severe bilateral lower and upper back pain.  (R. 428-29).  The pain was described as aching,
piercing, sharp, and throbbing.  (R. 428).  Tarpenning reported difficulty going to sleep,
wakening at night, tenderness, weakness, and muscle spasm.  Upon examination, Dr. Williams
noted diffuse trigger points, but that her joints were not hot, red, or swollen.  *Id.*  Dr. Williams
diagnosed Tarpenning with myalgia[17] and myositis[18] and noted it was a fibromyalgia flare-up.
*Id.*  He prescribed Norco and Tramadol for pain.  (R. 428-29).  He also indicated Tarpenning
may have some emotional issues due to her mother's illness.  *Id.*

On September 15, 2010, Tarpenning presented to Dr. Williams with complaints of
asthma and joint pain.  (R. 430-32).  Examination revealed decreased breath sounds, a non-
productive cough, diffuse expiratory rales, and diffuse trigger points.  (R. 431).  Also on this

---

[16] A rale is "a discontinuous sound consisting of a series of short nonmusical noises,
heard primarily during inhalation."  *Dorland's* at 1600.

[17] Myalgia is "pain in a muscle or muscles."  *Dorland's* at 1233.

[18] Myositis is the "inflammation of a voluntary muscle."  *Dorland's* at 1244.

13

date, Dr. Williams completed a Medical Source Statement regarding Tarpenning's physical limitations. (R. 419-20). Dr. Williams indicated that Tarpenning had the physical ability to lift and/or carry less than ten pounds on a frequent basis, and that she could sit for less than two hours, and stand and/or walk less than two hours in a normal 8-hour work day. (R. 419). Dr. Williams specified that Tarpenning would need to periodically alternate between positions of lying down, sitting, and standing to relieve her pain or discomfort. *Id.* He commented that Tarpenning had "extreme weakness and pain." *Id.* He noted that Tarpenning's ability to push and pull was limited in both her upper and lower extremities. *Id.* He found that she was limited in reaching in all directions, and that she was unable to do fine finger manipulation. (R. 420). Dr. Williams marked that Tarpenning should never balance, stoop, kneel, climb, crouch, or crawl. *Id.* Dr. Williams wrote that Tarpenning had "severe asthma" that precluded her from exposure to extreme temperatures, wetness, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, heights, machinery, and dangerous equipment. *Id.* He added that she should avoid even moderate exposure to noise. *Id.*

Patrice Wagner, D.O., an agency consultant, conducted a physical examination on July 30, 2009. (R. 308-12). Tarpenning reported to Dr. Wagner that her primary complaints were wheezing, shortness of breath, low back pain, and right knee pain. (R. 308). She reported that she became short of breath with walking and with moderate activity, and that her wheezing would sometimes become so bad that she could not speak. *Id.* Tarpenning reported back pain when walking, sitting, and standing for long periods of time, and needing to change positions after sitting or standing for more than ten to fifteen minutes. *Id.* She reported that she could perform all her activities of daily living and all of her household chores except vacuuming and

dusting, which aggravated her asthma.  *Id*.

Upon examination, Tarpenning moved all extremities well, except her right knee.  *Id*.
Examination of Tarpenning's right knee revealed she had decreased range of motion (90/150),
tenderness to palpation, and pain on full weight bearing. (R. 309-10).  Dr. Wagner found that
Tarpenning ambulated with a stable gait at an appropriate speed, moved about the exam room
with mild difficulty, and had a moderate limp favoring her right leg. (R. 309).   It was noted that
Tarpenning was wearing a knee brace due to a torn lateral meniscus and had knee surgery
scheduled for the following week.  (R. 308).  Tarpenning had normal toe and heel walking on her
left, but she was not tested on her right due to her knee injury.  (R. 309).  Tarpenning had some
swelling in her bilateral lower extremities from her ankles to mid-shin.  *Id*.  Tarpenning
demonstrated a full range of motion of her spine, though she experienced pain with range of
motion testing in her lumbar spine flexion.  *Id*.  Straight leg raises were negative in seated and
supine positions.  *Id*.   Grip strength and great toe strength were equal bilaterally and rated at 5/5.
*Id.*  No focal or sensory deficits were noted.  *Id*.  Tarpenning was able to pick up and manipulate
paperclips without difficulty.  *Id.*

During Dr. Wagner's examination, Tarpenning demonstrated a cough on deep breathing
and with conversation, but Dr. Wagner noted there were no wheezes, rales, or rhonchi.   (R.
309). Breathing tests were also performed on July 30, 2009.  (R. 313-17).  It showed that there
was a minimal obstructive lung defect and it was noted that Tarpenning had wheezing during the
testing.  (R. 313, 317).

On September 29, 2009, as part of Tarpenning's disability claim, she underwent testing
of the blood flow rate in the arteries of her lower extremities.  (R. 372).  The test results revealed

15

normal arterial blood flow rate in both of her legs.  *Id.*

Nonexamining agency consultant, Steve Neely, M.D., completed a Physical Residual

Functional Capacity Assessment on November 5, 2009.  (R. 387-94).  Dr. Neely found that

Tarpenning could frequently lift and carry less than ten pounds and occasionally lift and carry

ten pounds.  (R. 388).  She could stand or walk at least two hours in an 8-hour work day.  *Id.*  He

found that Tarpenning could sit for about six hours in an 8-hour work day.  *Id.*  Her ability to

push and pull was unlimited, other than the weight restrictions.  *Id.*  He noted no postural,

manipulative, visual, or communicative limitations.  (R. 389-91).  He found that Tarpenning

should avoid moderate exposure to fumes, odors, dusts, gases, and poor ventilation, but noted no

other environmental limitations.  (R. 391).  For narrative explanation, Dr. Neely addressed

Tarpenning's exertional limitations and her ability to perform activities of daily living.  (R. 387-

89).  Dr. Neely noted Tarpenning's limitations from osteoarthritis of her knee and obesity.  (R.

389).

On October 28, 2009, nonexamining agency consultant, Carolyn Goodrich, Ph.D.,

completed a Psychiatric Review Technique form.  (R. 373-86).  Dr. Goodrich noted that

Tarpenning did not have a severe mental impairment. (R. 373).  While Dr. Goodrich noted that

Tarpenning experienced anxiety, she opined that it did not satisfy the diagnostic criteria.  (R.

378).  Dr. Goodrich noted that Tarpenning had mild limitations in activities of daily living,

maintaining social functioning, and in maintaining, concentration, persistence, or pace.  (R. 383).

She noted that Tarpenning had no episodes of decompensation of extended duration.  *Id.*  Dr.

Goodrich noted that Tarpenning had never been to counseling, therapy, or an inpatient treatment

program.  (R. 385).  Dr. Goodrich noted Tarpenning's anxiety attacks were triggered by her

asthma and that she was taking Xanax, which helped calm her down. *Id.* Dr. Goodrich found there were no other limitations secondary to a mental condition. *Id.*

Nonexamining agency consultant Phillip Massad, Ph.D., reviewed the record on February 5, 2010, and affirmed Dr. Neeley's November 5, 2009 assessment. (R. 306). On February 1, 2010, nonexamining agency consultant Kenneth Wainner, M.D., reviewed the medical evidence in the record and affirmed Dr. Neeley's November 5, 2009 assessment. (R. 305).

### Procedural History

Tarpenning filed applications for disability insurance benefits and supplemental security income on April 29, 2009 and May 6, 2009 respectively, under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (R. 185-90). Tarpenning alleged onset of disability as September 21, 2008. (R. 185, 187). Tarpenning's application was denied initially and on reconsideration. (R. 72-84, 90-95). An administrative hearing was held before ALJ Gene M. Kelly on December 2, 2010. (R. 25-71). By decision dated December 16, 2010, the ALJ found that Tarpenning was not disabled. (R. 12-20). On October 18, 2011, the Appeals Council denied review of the ALJ's findings. (R. 1-6). Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. § 404.981.

### Social Security Law and Standard Of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if her "physical or mental impairment or impairments are of such severity that he is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[19]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  The Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin*

*v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to

support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the

court will "meticulously examine the record in order to determine if the evidence supporting the

---

[19]Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit her ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform her past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account her age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

agency's decision is substantial, taking 'into account whatever in the record fairly detracts from

its weight.'" *Id. (quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994)).  The

court "may neither reweigh the evidence nor substitute" its discretion for that of the

Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Tarpenning met insured status requirements through December 31,

2013.  (R. 14).  At Step One, the ALJ found that Tarpenning had not engaged in any substantial

gainful activity since her alleged onset date of September 21, 2008.  *Id.*  At Step Two, the ALJ

found that Tarpenning had severe impairments of "fibromyalgia, torn lateral meniscus, right

knee, torn right shoulder rotator cuff, asthma and asthmatic bronchitis, headaches, depression,

and anxiety."  *Id.*  The ALJ discussed Tarpenning's obesity and determined that it was not a

severe impairment.  (R. 14).  At Step Three, the ALJ found that Tarpenning's impairments, or

combination of impairments, did not meet the requirements of a Listing.  (R. 15).

The ALJ determined that Tarpenning had the RFC to perform a limited range of

sedentary work:

> In an 8-hour workday, she is able to stand and/or walk for 2 hours at 30-minute
> intervals.  She can sit for a total of 6 hours at 2-hour intervals. [She] is limited in
> her climbing and squatting.  Bending, stooping, crouching, crawling, and reaching
> overhead with her right upper extremity are occasional.  Also occasional are her
> twisting of her torso and kneeling.  There are slight limitations to her fingering,
> feeling, gripping with the right upper extremity, and twisting and nodding of the
> head.  She requires a work environment featuring low noise and light.
> Temperature extremes, humidity, wind, and damp environments must be avoided.
> There should be easy access to bathroom facilities. [Her] depression and anxiety
> cause a slight limitation in her contact with the public, coworkers, and
> supervisors.

(R. 16, 20).  At Step Four, the ALJ found that Tarpenning was unable to perform any past

relevant work.  (R. 18).  At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Tarpenning was capable of performing, considering her age, education, experience, and RFC.  (R. 19).  Therefore, the ALJ found that Tarpenning was not disabled from September 21, 2008 through the date of the decision.  (R. 20).

<b>Review</b>

On appeal, Tarpenning contends that the ALJ committed reversible error by not assigning a weight to the opinions of treating physician, Terrence Williams, D.O., and state agency physician, Patrice Wagner, D.O., and by including vague limitations in his RFC determination. Because the undersigned finds that the ALJ's decision is supported by substantial evidence and satisfies legal requirements, the ALJ's decision is affirmed.

**Medical Opinion Evidence**

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  A treating physician opinion must be given controlling weight if it is supported by "medically acceptable clinical and laboratory diagnostic techniques," and it is not inconsistent with other substantial evidence in the record.  *Hamlin*, 365 F.3d at 1215.  *See also* 20 C.F.R. § 404.1527(d)(2).  Even if the opinion of a treating physician is not entitled to controlling weight, it is still entitled to deference and must be weighed using the appropriate factors set out in Section 404.1527. *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004).  Those factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and

20

the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Goatcher v. U.S. Dept. of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995); 20 C.F.R. §§ 404.1527 and 416.927.  After weighing these factors, the ALJ must then "give good reasons in the notice of determination or decision for the weight" ultimately assigned.  *Watkins*, 350 F.3d at 1301 (internal quotation marks and alteration omitted).  The ALJ must consider every factor, but it is not necessary that he discuss each one explicitly because "not every factor for weighing opinion evidence will apply in every case."  *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).  The ALJ's reasoning and weight assessment must be sufficiently specific for a subsequent reviewing court to determine whether the correct legal standards were followed.  *Watkins*, 350 F.3d at 1300-01.

Tarpenning argues that the ALJ failed to indicate the weight he assigned to the opinions of Dr. Williams and Dr. Wagner.  Although the ALJ did not specifically state the weight he assigned to Dr. Williams' opinion, the ALJ did discuss his opinion in detail and specifically noted that it was not entitled to controlling weight.  (R. 17-18).  The ALJ discussed the medical evidence in the record, including medical records from Dr. Williams and his September 15, 2010 medical source statement.  (R. 17-18).  *Id.*  He reasoned that, because "[t]here [was] little or no basis for such sweeping denials of physical capacity" in Dr. Williams' report, and because he provided no empirical data for his conclusions, "Dr. Williams' medical source opinion [did] not have the supportability necessary for the granting of controlling weight."  (R. 18).

It is discernable from the ALJ's discussion that although Dr. Williams' opinion was not given controlling weight, it was given some weight.  While it would have been preferable for the

ALJ to state his reasoning with more clarity and specificity, the undersigned finds that his analysis was adequate, given the totality of his decision. *See Kruse v. Astrue*, 436 Fed.Appx. 879, 883 (10th Cir. 2011) (unpublished) (finding that the ALJ's weighing of medical opinion evidence was "readily apparent" even though he did not "state a specific weight").  As the Tenth Circuit recently explained in affirming the portion of an ALJ's decision addressing opinion evidence:

> Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.  In conducting our review, we should, indeed must, exercise common sense.  The more comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection.

*Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012).  *See also Doyal v. Barnhart*, 331 F.3d 758, 761 (10th Cir. 2003) ("the form of words should not obscure the substance of what the ALJ actually did"); *Lauxman v. Astrue*, 321 Fed. Appx. 766, 769 (10th Cir. 2009) (unpublished) (while "it would have been helpful if the ALJ had elaborated on his treatment" of opinion evidence, the ALJ's decision was adequate).

The ALJ's discussion demonstrates that he considered the *Goatcher* factors.  For example, the ALJ discussed details from Dr. Williams' progress notes over a span of two years, implicitly evidencing his consideration of the extent and length of Tarpenning's treatment relationship with Dr. Williams.  (R. 17).  It is even more clear that the ALJ considered the third and fourth *Goatcher* factors - the degree to which Dr. Williams' opinion was not supported by relevant evidence and the inconsistency between his opinion and the record as a whole.  The ALJ expressly discussed the lack of evidentiary support and the inconsistency of the opinion; he noted that "Dr. Williams provide[d] no empirical data for his conclusions," that "some of his

22

limitations for the claimant seem[ed] exaggerated, especially his prohibitions of all postural activities," and that Tarpenning's physical ailments "[did] not appear to be so restrictive."  *Id.* These are legitimate and supported reasons for discounting the opinions of Dr. Williams.  *See Pisciotta v. Astrue*, 500 F.3d 1074, 1078 (10th Cir. 2007) (medical evidence may be discounted if it is inconsistent with other evidence); *Castellano v. Sec'y. of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994 ("treating physician's opinion may be rejected if his conclusions are not supported by specific findings").

Tarpenning does not cite to anything in her objective medical records that supports Dr. Williams' opinion or that is inconsistent with the ALJ's RFC finding, and the Court finds none. Tarpenning does not even contest that the ALJ fully discussed the medical evidence of record or her own testimony and credibility.  Moreover, it is clear that the ALJ did not completely reject the opinion of Dr. Williams, as he did incorporate some of the limitations found by Dr. Williams into his RFC, even though they were not indicated by the agency consultants.  (R. 17-18, 388–94, 397-401, 419-20).

Tarpeninng further argues the ALJ failed to assign a weight to the "opinion" of Dr. Wagner, yet she fails to cite what that "opinion" was, or how it was inconsistent with the ALJ's RFC finding.  First, Dr. Wagner's report does not contain a medical opinion.  A "true medical opinion" is a statement from an "acceptable medical source" and contains a doctor's "judgment about the nature and severity of [the claimant's] physical limitations, or any information about what activities [the claimant] could still perform."  *Cowan v. Astrue,* 552 F.3d 1182,1188-89 (10th Cir. 2008), 20 C.F.R. § 1527(a)(2).  Dr. Wagner's report consisted of Tarpenning's medical history and a summary of Tarpenning's examination, but it did not include any opinion

regarding Tarpenning's physical limitations or what activities she could perform.  (R. 308-12).

Although the ALJ did discuss Dr. Wagner's observations, he was under no obligation to assign a

specific weight to her examination and the court finds that the ALJ's discussion of Dr. Wagner's

examination was adequate.  When evidence does not conflict with the ALJ's RFC determination,

the ALJ has a reduced burden to expressly discuss the evidence.  *Howard v. Barnhart*, 379 F.3d

945, 947 (10th Cir. 2004) ("When the ALJ does not need to reject or weigh evidence

unfavorably in order to determine a claimant's RFC, the need for express analysis is

weakened.").

Given the ALJ's reasoning in rejecting Dr. Williams' opinion and the substantial

evidence in record supporting his RFC finding, the ALJ did not err in his assignment of weight

to the opinions of the respective physicians.

**Residual Functional Capacity**

Tarpenning also contends the ALJ made reversible error by failing to appropriately

define the word "slight" in his RFC determination.  As stated above, Tarpenning's RFC

contained "slight" limitations to "fingering, feeling, gripping with the right upper extremity, and

twisting and nodding of the head," and a "slight" limitation in "contact with the public,

coworkers, and supervisors."  (R. 16).  While the ALJ summarized these limitations as "slight,"

his explanation to the Vocational Expert ("VE") provided a detailed description of the intended

extent of the limitations.  (R. 60-64).  Specifically, the ALJ determined that, as to the limitations

on the right upper extremity,

> . . . I'm not trying to rule out use of the hands. I'm just saying this person
> shouldn't be doing a lot of extensive work with the hands and fingers on small,
> tedious tasks like small nuts and bolts, pen and clip fastening.  This is a person
> who wouldn't have trouble putting their child's bicycle together, but they might

have trouble after awhile playing with the child's erector set, working with those types of small nuts and bolts.

(R. 60-61).  He further defined "slight" in the context of contact with the public, coworkers, and supervisors as:

> Contact with the people should be brief and cursory.  It could be repetitive, but it has to be brief and cursory.  A fast food worker would fall within [the] confines of this restriction.  It's brief, it's cursory, people come and go, but you don't spend much time with them.  It's not a complicated task to go pick a burger up from the bin and put it out.
>
> A bank teller may be brief, but it may be more complex than I anticipate with this restriction.  A clothing salesperson may not be complex, but it may be more prolonged contact than I anticipate.  You might spend a lot, an hour or more with someone, showing them clothes.  In dealing with co-workers, again, it should be brief and cursory.  I don't see this restriction, by itself, restricting work on an assembly line, but this person should not be an integral member of a team that will participate in goal setting, process planning, things of that nature.  I do not intend to restrict routine, ordinary supervision.

(R. 61-62).

Because the ALJ sufficiently defined the term "slight" in his hypothetical to the VE, the undersigned finds no reversible error in the RFC and its use at Step Five. *Luttrell v. Astrue*, 453 Fed.Appx. 786, 790 (10th Cir. 2011) (unpublished) (substantially similar description of slight limitation on contact with public was sufficiently "fleshed out in concrete terms" at the hearing); *Ramsey v. Barnhart*, 117 Fed.Appx. 638, 640 (10th Cir. 2004) (unpublished) (using the definition discussed at the hearing to supplement the ALJ's decision). *See also Stokes v. Astrue*, 274 Fed.Appx. 675, 678, 687 (10th Cir. 2008) (unpublished) (finding no error in use of substantively identical language of slight limitation in fingering, feeling, grasping, and slight limitation with public, coworkers and supervisors).

**Conclusion**

25

The Court finds that the ALJ thoroughly and thoughtfully considered the medical evidence and opinion evidence of record and Tarpenning's testimony and credibility. The ALJ fully explained the reasons for the findings he made at each step of the sequential process and related those findings to the evidence.  The decision is thus supported  by substantial evidence and satisfies the application of the correct legal standards.  Based upon the foregoing, the decision of the Commissioner is **AFFIRMED**.

Dated this 13th day of March, 2013.

Paul J. Cleary
United States Magistrate Judge